IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:05CR 3099 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| KELVIN R. LYONS and | ) | REPORT, RECOMMENDATION, |
| MICHAEL ELMA, | ) | AND ORDER |
| | ) | |
| Defendants. | ) | |

Defendants have filed motions to suppress evidence seized from the vehicle they were traveling in on September 5, 2005 on Interstate 80 in Nebraska. A hearing was held on the motions on December 22, 2005 and counsel were given leave to submit post-hearing briefs. I now recommend that the motions be denied.

**FACTS**

On that date Nebraska State Patrol Trooper Wendy Brehm was traveling westbound on I-80 in Hamilton County, Nebraska at approximately 12:56 p.m. when she observed a white Dodge Caravan with Arizona license plates traveling eastbound at what she estimated was an excessive speed. She turned her vehicle around in the median, followed the Caravan, and obtained a VASCAR clock on the vehicle, verifying that the vehicle was speeding. She initiated a traffic stop.

The driver of the vehicle was defendant Lyons; the passenger was defendant Elma. Trooper Brehm approached the passenger side of the vehicle and contacted the occupants. She explained the reason

for the stop, at which time Lyons admitted he was traveling 80 mph when the posted speed limit was 75 mph.  She asked for his drivers license and the vehicle's registration.  Lyons produced an Ohio drivers license and a vehicle rental agreement.  She directed him to take a seat in her patrol vehicle so she could write him a warning ticket for speeding, and he did so.

In the patrol car Brehm checked with her dispatch personnel about the validity of Lyons's Ohio drivers license and was informed that it was valid.  She also checked on wants and warrants as well as prior criminal history and was advised both were negative.  She also examined the rental agreement, observed that the vehicle had been rented to Lyons, the driver, and noted that the vehicle had been rented in Phoenix at 11:57 p.m. September 3, 2005.

While completing the above tasks and writing the warning citation, Brehm asked Lyons about his travels.  He told her he had been in Phoenix visiting friends at Arizona State University for three days, but when asked what year in school they were, he revised his statement and said they weren't students but rather just lived in the Tempe area.  He also informed her that his passenger, Elma, was also from Ohio.  In response to her question about how they had traveled to Phoenix, Lyons said they had flown to Phoenix, and in response to her question as to why they were driving back, he said they'd just "decided" to drive back.  She then inquired about the fact that the rental agreement called for the return of the vehicle to Chicago that afternoon at 4:00 p.m. He answered he was aware they were going to be late in returning it.  Asked why they were going to Chicago when they lived in Ohio, he stated that they were going to visit Elma's cousin for one day, then rent a different vehicle for the trip back to Ohio.  Brehm then returned Lyons's license and the rental agreement, handed him

2

the warning ticket, and asked Lyons to remain in her cruiser while she contacted Elma.

She walked to the Caravan and asked Elma about the pair's travels. He told her that he and Lyons were in Arizona because he, Elma, was visiting a friend in Tucson. He said they planned to drive directly back to Ohio without making any interim stops. When she asked him about the vehicle rental agreement requiring its return to Chicago, Elma said he was aware of that, and did not know why they were stopping in Chicago. He then said that he and Lyons were planning to fly back to Ohio from Chicago.

Brehm returned to the patrol vehicle and asked Lyons if there was any contraband in the Caravan. He said, "no." She then asked him for permission to search the van, and he declined, saying he'd been humiliated by airport security and did not want to go through that again. Brehm then contacted dispatch and requested a canine team be sent to the scene.

Brehm then returned to the van and asked Elma to exit the van and to be seated in the rear seat of her cruiser. As he was exiting the van she told him to leave the keys in the van, in case the two front windows, which were then down, had to later be closed. He complied.

Approximately thirty minutes later Sgt. Andrew Duis and his dog "Capone" arrived. Duis walked the dog around the vehicle, but the dog did not indicate the presence of drugs. Duis testified that the dog "alerted" at several points during the walk-around, meaning that he began sniffing actively and "showing an interest" in the van. He told Brehm at the time that the dog was detecting the odor of drugs "everywhere," but could not pinpoint the

strongest odor.  Duis walked Capone around again, and this time he stuck his head into the interior of the van through the open front passenger window and immediately sat down, his way of indicating the point of the strongest smell of drugs.  The van was then searched and over one hundred pounds of marijuana was found, whereupon both defendants were arrested.

## DISCUSSION

**1.  The Stop**

First, defendant Elma claims that there was no probable cause for the stop of the Dodge Caravan.  However, based on Trooper Brehm's experience as a Nebraska State Patrol road trooper for nine years, her estimate of the van's speed, and her verification of the fact it was speeding by using her VASCAR equipment, her conclusion that the van was speeding was reasonable, and therefore, there was probable cause for the stop.  United States v. Barahona, 990 F. 2d 412, 416 (8th Cir. 1993).

**2.  Elma's "Standing"**

The government claims defendant Elma did not have a legitimate expectation of privacy in the van, and therefore, he cannot contest the search of its contents.  Elma argues that because he may contest his own detention and had a legitimate expectation in his possessions inside the van, he can contest the search as well as any statements made by him as a result.  I assume, for the purposes of this matter, that Elma has standing to raise all the issues he raises in his motion.

4

**3. Scope of the Traffic Stop**

"Typically, a reasonable investigation of a traffic stop may include asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose." United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994). The evidence establishes that Brehm's questions to Lyons were not overly intrusive and did not veer outside the limits of information necessary and/or relevant to the purposes of the traffic stop.

Lyons and Elma argue, however, that the traffic stop ended when the trooper gave Lyons his license, the car rental agreement, and the warning ticket, approximately six minutes into the stop. They argue that at the point in time when she directed Lyons to remain in the patrol car while she spoke with Elma in the van, they were unlawfully detained without reasonable, articulable suspicion. United States v. Beck, 140 F.3d 1129, 1134 (8th Cir. 1998). I disagree.

"Reasonable articulable suspicion" is required to expand a traffic stop into an investigation of other criminal activity. Id. "Reasonable articulable suspicion," however, while "more than an inchoate hunch," United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2005), citing United States v. Sokolov, 490 U.S. 1, 7 (1989), is barely so. It requires only "some minimal, objective justification," based on the totality of the circumstances. Id. Like probable cause, "reasonable articulable suspicion" is not a formulaic equation; the totality of the circumstances are to be evaluated in a common-sense fashion, recognizing that seemingly innocent individual facts can take on criminal significance by a

5

trained and experienced law enforcement officer.  See <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983).

Before the trooper gave Lyons the rental agreement, license, and warning ticket, she had learned that two Ohio residents had flown to Phoenix, Lyons to see friends at Arizona State University, later amended to friends who lived near Arizona State University in Tempe; they had been in Phoenix only three days; they had just "decided" to drive back to Ohio instead of flying back; they had "several large pieces of luggage" filling the rear portion of the vehicle, considering they were in Arizona only three days; they were going to stop in Chicago to see Elma's cousin, but instead of driving the same vehicle on to Ohio, planned to turn in the van and drive another rental vehicle to Ohio.

Applying the "common-sense" test of <u>Gates</u>, I conclude several circumstances of this situation were suspicious.[1]

First, while it would not be unusual for a couple of friends to fly across the country to see friends for only a few days on a holiday weekend, to fly only one way and return by driving was peculiar, for it is common knowledge that round-trip air tickets are generally cheaper than double a one-way fare, and one-way car rentals are generally more expensive than returns to the same city. In addition, driving back to Ohio from Phoenix would take considerably longer than flying, inconsistent with only a three-day

---

[1] Although these inferences are "articulable," Trooper Brehm did not specifically "articulate" each of the inferences I discuss in this section.  I have made these inferences based upon what I consider common-sense, commonly known or believed generalizations from everyday experiences of many in the general public.  From the evidence it is probable that she made the same inferences, even though she did not list all of them specifically.

6

visit.  There could be perfectly legitimate reasons for doing so, but no reason was given by Lyons; rather, he said only that they had "decided" to do so.

In addition, the "several large pieces of luggage" in the rear seats of the van were inconsistent with a brief trip.  Again, there could be legitimate reasons for that circumstance, but none was offered by the defendant.

Finally, the vehicle was going to be turned back into the rental company in Chicago, when they were stopping off in Chicago for only a one-day visit to Elma's cousin, and a different vehicle would be rented in Chicago for the final leg of the trip to Ohio. This was suspicious because most people would not change rental vehicles for a one-day stopover, as doing so would be inconvenient and it is usually more expensive to rent a vehicle for individual days than for a week.

Because of these circumstances, Trooper Brehm had "reasonable articulable suspicion" to detain Lyons and investigate further, even before she approached the van a second time and engaged defendant Elma in conversation.  When his answers to her questions differed from those of defendant Lyons, additional suspicion was legitimately aroused.  It was reasonable for the trooper to expand the investigation and ask for permission to search the vehicle, and it was reasonable for her to request a canine team when permission was refused.

**4.  Delay Before the Dog Arrived**

Defendants also argue that the length of delay before Sgt Duis arrived with Capone excessively prolonged the stop in violation of

7

the Fourth Amendment. However, the delay here was necessitated by the fact that the nearest drug dog was Sgt. Duis's dog, and Sgt. Duis was not on duty at the time Brehm requested a dog. Duis's arrival in approximately half an hour was not excessive under the circumstances. See, United States v. Sanchez, 417 F. 3d 971 (8th Cir. 2005) (45 minutes not excessive); United States v. White, 42 F.3. 457 (8th Cir. 2005) (80 minutes not excessive); United States v. Bloomfield, 40 F. 3d 910 (8th Cir. 1994)(en banc) (one hour not excessive).

## 5. Scope of the Canine Sniff

The defendants also argue that the canine search violated the Fourth Amendment in that Capone was directed by Sgt. Duis to sniff *inside* the vehicle instead of being restrained and limited to the vehicle's *exterior*. First, they argue the front windows of the van were open at Trooper Brehm's direction. The videotape indicates that the passenger window was opened by Elma without any verbal order or request from Trooper Brehm, but the circumstances were such that had the window not been voluntarily opened, Brehm would have ordered it opened in order for her to make contact with the defendants for purposes of the traffic stop. Apparently both front windows were open, but that is not clear. In any event, there was never any order by Brehm to keep the windows open. Brehm did order Elma to leave the keys in the vehicle in case they were needed to close the windows later, presumably for the dog sniff, but he did not take that opportunity to close them himself. Brehm told Duis that the windows were open prior to the initiation of the dog's first sniff around the vehicle. Duis acknowledged that, but did not ask Brehm to close them or close them himself. Certainly the defendants could have closed them before exiting the vehicle if they had wished; defendants may have purposely left them open to

8

"ventilate" the passenger compartment of the van, hoping to thwart the detection of the scent of drugs. I infer from all of this evidence that the defendants left the vehicle windows open of their own volition.

Defendants argue that Duis "directed his dog to invade the van through the open passenger side window." Def. Elma's Post-Hearing Brief, Filing 41, p. 8. Defendants claim that by penetrating the plane of the window opening with his nose, the dog entered the vehicle and conducted a search of its interior without consent or probable cause, violating the defendants' reasonable expectation of privacy. Sgt. Duis testified that he did not direct the dog to breach the vehicle's interior, but rather, he simply directed the dog to sniff the outside of the vehicle at the level of the window, and the dog stuck his head in the window "on his own." Tr. 91:18-24.

The government argues, first, that a dog sniff is not a search, citing United States v. Williams, 429 F. 3d 767 (8th Cir. 2005), and Illinois v Caballes, 543 U.S. 405 (2005). Therefore, the government argues, not even reasonable suspicion was required to have Capone sniff the defendants' vehicle. Brief in Opposition to Motion to Suppress, filing 34, p. 6. Both Williams and Caballes, however, were *exterior* searches; thus, while the argument is good as far as an *exterior* search may be concerned, it does not apply to the circumstance of the dog searching the *interior* of the vehicle without a warrant or consent.

The government also argues that since Duis testified that he did not purposely direct the dog to penetrate the plane of the window's opening, this case is similar to United States v. Stone, 866 F. 2d 359 (10th Cir. 1989). In Stone, the defendant opened the

9

hatchback of his vehicle and the drug dog immediately, without prompting or directing by the handler, jumped up into the car through the hatchback. The court specifically found in Stone, that the handler did not "encourage" the dog to jump in the car and therefore, the dog's "instinctive" actions were not a "search" by the officer.  866 F. 2d at 364.

The evidence in this case is not nearly so unequivocal.  The videotape shows Duis leading the dog on a leash around the vehicle twice.  The first time, Duis moves his hand both down near the floor or underside of the vehicle and up near the windows or deck areas of the vehicle on all sides.  The dog follows his hand and sniffs in the areas indicated by Duis, sometimes getting up on his hind legs.  After the first trip around the vehicle, Duis can be heard to say that the dog was smelling drugs "essentially everywhere" but couldn't yet detect the strongest odor, or the source of the odor.  The second "lap" around the vehicle is largely the same as the first, but Capone gets up on his hind legs on the front passenger door and appears to lean far forward so as to stick his head inside the open window into the interior of the van, and then immediately sits down, his indication that he had found the strongest source of the odor of illegal drugs.

Defendants claim Duis raised his hand "up to the open window knowing that Capone would follow his command." Def. Lyons's Supplemental Brief in Support of Motion to Suppress, Filing 39, p. 5, thereby "facilitating" the dog's entering the interior of the van or "cuing" the dog to put his nose through the open window. Defendants argue that this distinguishes this case from Stone, citing United States v. Winningham 140 F. 3d 1328, 1333, n. 2 (10th Cir. 1998).  In Winningham the Tenth Circuit did distinguish the two cases on the basis that the government may not be the moving

10

force to "create the opportunity" for a drug dog to go where the officer him/herself cannot go, but the government apparently has no obligation to *prevent* the dog from following its instincts if the defendant creates the opportunity. Id.

In this case it appears on the videotape that the dog stuck his head through the open window and sniffed the interior of the van. If one accepts the proposition that the "plane" of the window track is the boundary of the "inside" of the car, Capone breached that boundary. I have also found that the window was open by virtue of the defendants' actions or inactions, not Trooper Brehm's, and not Sgt Duis's.

In testifying about his training and experience, Duis said he knows he cannot have the dog enter a vehicle without a warrant or consent. (Tr. 88:15-18). He also has been trained that if the dog enters the vehicle on its own, it would not be a search of constitutional dimensions. (Tr. 88:21-23). In explaining his actions leading the dog around the van, Sgt. Duis stated:

> A: What I'm doing with my hand is what we refer to as a directed search. What I'm doing is pointing to areas where I want him to search. We teach the dog to follow our hand; we make sure--that way we know he's covered all of the area. So--Sometimes I'll say, you know, "search up here," you know, I don't actually say that, but by signaling to him I want him to search high, or I want him to search low, or I want him to search a particular spot.
>
> Q: So if you pointed to the driver's side window, you're asking him to sniff the driver's side window?
>
> A: In that area, yes.
>
> Q: And if you point to the passenger side window, you're asking him to search the passenger side window?
>
> A: Correct.

11

> Q:   And you did point to the driver's side window?
>
> A:   I very well may have, yes.
>
> Q:   And you did point to the passenger side window?
>
> A:   Again, very well may have.
>
> Q:   And Capone follows your directions?
>
> A:   Yes he does.

Tr. 90:11-91:6.  He also said that he did not stick his hand through the window, and when Capone stuck his head through the window, "That's on his own.  He was not directed inside the vehicle." Tr. 91:18-24.  There is nothing in the evidence, either on the videotape or in the testimony, that contradicts that assertion.

Duis was not asked whether his "directing" the dog at the passenger front window was any different because the window was open.  There is nothing in the videotape that would indicate anything different about Duis's actions at that point in the walk-around, and his testimony likewise does not so state.  Therefore, I find that the actions of Sgt. Duis at that point in the sniff were not different because the window was open.  He did not "create the opportunity" for the dog to stick his head in the open window.  No authority has been cited to me, nor have I found any, to the effect that the handler of a drug dog must affirmatively close an open passenger window of a vehicle before conducting a dog sniff.

Duis simply took the situation as he found it.  Both Duis and Capone were outside the vehicle until the odor of the drugs briefly drew Capone through the window opening.  In this circumstance the "plain smell" doctrine would apply, even if Capone had not penetrated the plane of the window track.  See, e.g., United States

12

v.McCoy, 200 F.3d 582, 584 (8th Cir.2000) (per curiam) ("plain smell" rule); United States v. Roby, 122 F.3d 1120 (8th Cir. 1997) (smell of illegal drugs escaping to a common hallway outside defendant's hotel room):

> Roby contends the dog's detection of the odor molecules emanating from his room is the equivalent of a warrantless intrusion. We find that it is not. The fact that the dog, as odor detector, is more skilled than a human does not render the dog's sniff illegal. See United States v. Sullivan, 625 F.2d 9, 13 (4th Cir.1980). Just as evidence in the plain view of officers may be searched without a warrant, see Harris v. United States, 390 U.S. 234, 236 (1968), evidence in the plain smell may be detected without a warrant. See United States v. Harvey, 961 F.2d 1361, 1363 (8th Cir.1992); See also Horton v. Goose Creek Independent School District, 690 F.2d 470, 477 (5th Cir.1982).

122 F.3d at 1124-1125. With the window open there is little doubt from the evidence here that Capone would have smelled the odor of the drugs in this case even if he had been reined back and held outside the plane of the window track. Duis's interpretation of the dog's actions during the first "lap" around the vehicle was that the odor was emanating from everywhere around the vehicle, and Capone merely identified its strongest source when he "indicated" at the passenger front window.

In addition, to the extent that the defendants claim a legitimate expectation of privacy in the drugs and the odors emanating therefrom, the Supreme Court dashed that notion in Caballes, at least as to odors *outside* the vehicle. In such cases, because the dog is trained to indicate only on the odor of illegal narcotics and not disclose any items or activities that are within

13

the zone of privacy society recognizes as legitimate, the dog's sniffing and indicating the odor of drugs *outside* the vehicle did not implicate the Fourth Amendment. 543 U.S. at 408-409. See also United States v. Brock, 417 F.3d 692, 695-697 (7th Cir. 2005) (Dog sniff outside defendant's locked door did not violate Fourth Amendment as no privacy interest in contraband, distinguishing Caballas from Kyllo v. United States, 533 U.S. 27 (2001)).

I conclude in the circumstance here presented that the actions of Capone in sticking his head inside the van were not directed by the handler, but were, instead, the dog's own actions initiated by the dog himself. The evidence is that Sgt. Duis read the dog's actions during the first "lap" around the vehicle as Capone alerting to the odor of drugs. Capone was communicating that the odors were in fact *outside* the vehicle. Therefore, the extra few inches his nose was inside the window did not make any difference in this case, for even if the dog had been restrained and had not actually penetrated the "plane" of the window, the odors from the marijuana were still present *outside* that plane, through the open window. The open window would still have been the strongest source for the odor, and Capone would have indicated to that area of the vehicle, just as he did.

For all of these reasons, I conclude that the arguments of the defendants should be rejected and the motions denied. Because Defendant Elma's motion also seeks to suppress statements he made following his arrest, based only on the statements being the "fruit of the poisonous tree," that is, the search, I need not address that issue as a separate Fifth Amendment claim.

IT THEREFORE HEREBY IS RECOMMENDED to the Hon. Richard G. Kopf, United States Chief District Judge, pursuant to 28 U.S.C.

§636(b)(1)(B) that the defendants' motions to suppress, filings 24 and 32, be denied.

The parties are notified that failure to object to this recommendation as provided in the local rules may result in a waiver of the right to appeal the district judge's adoption of findings in the recommendation.

FURTHER, IT HEREBY IS ORDERED: Trial of this case is set to commence at 9:00 a.m. on **April 17, 2006** before the Hon. Richard G. Kopf, United States District Judge in Courtroom #1, Denney United States Courthouse and Federal Building, Lincoln, Nebraska. Trial is scheduled for a duration of three trial days. Jury selection will be at commencement of trial.

Dated February 15, 2006

BY THE COURT

s/ *David L. Piester*
United States Magistrate Judge